34 P.3d 1100

**Gregory CORLISS, Plaintiff–
Counterdefendant–
Appellant,**

v.

**Jann WENNER and Larry Anderson,
Defendants–Counterclaimants–
Respondents.**

No. 25351.

Court of Appeals of Idaho.

Sept. 5, 2001.

Review Denied Nov. 27, 2001.

Hawley, Troxell, Ennis & Hawley, Ketchum; David H. Middleton & Assoc., Federal Way, Washington, for appellant. David H. Middleton argued.

Robertson, Hepworth, Slette, Worst & Stover, Twin Falls, for respondent, Wenner. Gary D. Slette argued.

Brian E. Elkins, Ketchum, argued for respondent Anderson.

SCHWARTZMAN, Chief Judge.

Gregory Corliss appeals from the district court's orders granting summary judgment in favor of Jann Wenner on the right to possess ninety-six gold coins unearthed by Anderson and Corliss on Wenner's property and in favor of Larry Anderson on a promissory note signed by Corliss. We affirm.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The Gold Coins

In the fall of 1996, Jann Wenner hired Anderson Asphalt Paving to construct a driveway on his ranch in Blaine County. Larry Anderson, the owner of Anderson Asphalt Paving, and his employee, Gregory Corliss, were excavating soil for the driveway when they unearthed a glass jar containing paper wrapped rolls of gold coins. Anderson and Corliss collected, cleaned, and inventoried the gold pieces dating from 1857 to 1914.[1] The coins themselves weighed about four pounds. Anderson and Corliss agreed to split the gold coins between themselves, with Anderson retaining possession of all the coins. At some point Anderson and Corliss argued over ownership of the coins and Anderson fired Corliss. Anderson later gave possession of the coins to Wenner in exchange for indemnification on any claim Corliss might have against him regarding the coins.

Corliss sued Anderson and Wenner for possession of some or all of the coins. Wenner, defending both himself and Anderson, filed a motion for summary judgment. The facts, except whether Corliss found all or just some of the gold coins without Anderson's help, are not in dispute. All parties agree that the coins were unearthed during excavation by Anderson and Corliss for a driveway on Wenner's ranch, that the coins had been protected in paper tube rolls and buried in a glass jar estimated to be about seventy years old. Following a hearing on Wenner's motion for summary judgment, the district court declined to grant the motion and allowed approximately five months for additional discovery. Six months later the court held a status conference at which counsel for Wenner and Anderson asked the court to rule on Wenner's motion and counsel for

---

1. Of the ninety-six coins gathered up by Anderson and Corliss, there were thirty-six five-dollar gold pieces with mint dates ranging from 1857 to 1909, twenty-two ten-dollar gold pieces dating from 1882 to 1910, and thirty-eight twenty-dollar gold pieces dating from 1870 to 1914. Corliss claimed the value of the coins was in excess of $30,000 and at oral argument offered a value of between $500,000 and $1,000,000. Counsel for Wenner countered that the value of the coins was between $25,000 and $30,000. There is no independent appraisal of the coins in the record.

Corliss did not object. No new facts were offered.

The district court then entered a memorandum decision stating that the "finders keepers" rule of treasure trove had not been previously adopted in Idaho, that it was not a part of the common law of England incorporated into Idaho law at the time of statehood by statute, and that the coins, having been carefully concealed for safekeeping, fit within the legal classification of mislaid property, to which the right of possession goes to the land owner. Alternatively, the court ruled that the coins, like the topsoil being excavated, were a part of the property owned by Wenner and that Anderson and Corliss were merely Wenner's employees. Corliss appeals.

### B. The Promissory Note

After agreeing to split the gold coins, Corliss obtained a personal loan of nearly $9,000 from Anderson and signed a promissory note in which he pledged half of the coins as collateral. Sometime later Corliss and Anderson made a notation that the total amount owed on the note was $11,970, due April 1, 1997, with no further interest. Corliss offered to pay off the promissory note in exchange for half of the gold coins, but Anderson refused. Anderson demanded unconditional payment on the note. After Corliss sued Anderson and Wenner, Anderson counterclaimed against Corliss for judgment on the promissory note.

Following the grant of summary judgment in favor of Wenner, Anderson filed a motion for summary judgment on the note. Thereafter the district court granted judgment on Anderson's motion in the amount of $17,233.36, consisting of the $11,970 in principal, $1,695.36 in accrued interest from the date of demand, plus $3,568 in attorney fees and costs. Corliss appeals.

## II.

### STANDARD OF REVIEW

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. I.R.C.P. 56(c); *Dunham v. Hackney Airpark, Inc.*, 133 Idaho 613, 616, 990 P.2d 1224, 1227 (Ct.App.1999) (citing *Ed-*

*wards v. Conchemco, Inc.*, 111 Idaho 851, 852, 727 P.2d 1279, 1280 (Ct.App.1986)). In order to determine whether judgment should be entered as a matter of law, the trial court must review the pleadings, depositions, affidavits, and admissions on file. I.R.C.P. 56(c).

In general, a party opposing summary judgment is entitled to favorable inferences from the underlying facts. *See Tolmie Farms v. J.R. Simplot Co., Inc.*, 124 Idaho 607, 609, 862 P.2d 299, 301 (1993). In this case, we note that none of the parties requested a jury trial, thus the court was to be the trier of fact. Furthermore, at a status conference, held after allowing the completion of discovery into the antiquity of the coins, counsel for Wenner and Anderson stated that the case was ready for summary judgment. Counsel for Corliss stated that he had nothing to add to the record. "When the evidentiary facts are not disputed and the judge rather than the jury will be the ultimate trier of fact, the judge may draw the inferences he or she deems most probable since the judge alone would be responsible for drawing such inferences from the same facts at trial." *Dunham*, 133 Idaho at 616, 990 P.2d at 1227. Therefore, the court in this case was entitled to draw all reasonable inferences from the facts presented.

## III.

### LAW APPLICABLE TO DETERMINING THE RIGHTFUL POSSESSOR OF THE GOLD COINS

### A. Standard Applicable To Review Of The District Court's Choice Of Law

This is a case of first impression in Idaho, the central issue being the proper rule to apply in characterizing the gold coins found by Corliss and Anderson on Wenner's property. The major distinctions between characterizations of found property turn on questions of fact, i.e., an analysis of the facts and circumstances in an effort to divine the intent of the true owner at the time he or she parted with the property. *See generally* 1 Am.Jur.2d *Abandoned, Lost and Unclaimed Property* §§ 1–14 (1994). The material facts and circumstances surrounding the discovery of the gold coins are not in dispute. Howev-

er, the characterization of that property, in light of these facts, is a question of law over which we exercise free review. *Schley v. Couch*, 155 Tex. 195, 284 S.W.2d 333, 336 (1955) (While the character of property is determined from all the facts and circumstances in the particular case of the property found, the choice among categories of found property is a question of law.); *see also Batra v. Batra*, 135 Idaho 388, 392, 17 P.3d 889, 893 (Ct.App.2001) (The characterization of an asset as separate or community, in light of the facts found, is a question of law.). With these principles in mind we now discuss, in turn, the choice of categories applicable to the district court's characterization of the gold coins found by Anderson and Corliss, recognizing that the choice of characterization of found property determines its rightful possessor as between the finder and landowner.

## B.   Choice Of Categories

At common law all found property is generally categorized in one of five ways. *See Benjamin v. Lindner Aviation, Inc.*, 534 N.W.2d 400 (Iowa 1995); *see also* 36A C.J.S. *Finding Lost Goods* § 5 (1961); 1 Am.Jur.2d, *Abandoned, Lost, Etc.*, § 10 (1994). Those categories are:

■ ABANDONED PROPERTY—that which the owner has discarded or voluntarily forsaken with the intention of terminating his ownership, but without vesting ownership in any other person. *Terry v. Lock*, 343 Ark. 452, 37 S.W.3d 202, 206 (2001);

■ LOST PROPERTY—that property which the owner has involuntarily and unintentionally parted with through neglect, carelessness, or inadvertence and does not know the whereabouts. *Id; Ritz v. Selma United Methodist Church*, 467 N.W.2d 266 (Iowa 1991);

■ MISLAID PROPERTY—that which the owner has intentionally set down in a place where he can again resort to it, and then forgets where he put it. *Terry*, 37 S.W.3d at 206;

■ TREASURE TROVE—a category exclusively for gold or silver in coin, plate, bullion, and sometimes its paper money equivalents, found concealed in the earth or in a house or other private place. *Id.* Trea-

sure trove carries with it the thought of antiquity, i.e., that the treasure has been concealed for so long as to indicate that the owner is probably dead or unknown. 1 Am. Jur.2d *Abandoned, Lost, Etc.*, § 8 (1994);

■ EMBEDDED PROPERTY—that personal property which has become a part of the natural earth, such as pottery, the sunken wreck of a steamship, or a rotted-away sack of gold-bearing quartz rock buried or partially buried in the ground. *See Chance v. Certain Artifacts Found and Salvaged from the Nashville*, 606 F.Supp. 801 (S.D.Ga.1984); *Ferguson v. Ray*, 44 Or. 557, 77 P. 600 (1904).

■ Under these doctrines, the finder of lost or abandoned property and treasure trove acquires a right to possess the property against the entire world but the rightful owner regardless of the place of finding. *Terry*, 37 S.W.3d at 206. The finder of mislaid property is required to turn it over to the owner of the premises who has the duty to safeguard the property for the true owner. *Id.* Possession of embedded property goes to owner of the land on which the property was found. *Allred v. Biegel*, 240 Mo.App. 818, 219 S.W.2d 665 (1949) (citing *Elwes v. Brigg Gas Co*, 33 Ch. D. 562 (Eng.1886)); 1 Am.Jur.2d *Abandoned, Lost, Etc.*, § 29.

One of the major distinctions between these various categories is that only lost property necessarily involves an element of involuntariness. *Campbell v. Cochran*, 416 A.2d 211, 221 (Del.Super.Ct.1980). The four remaining categories involve voluntary and intentional acts by the true owner in placing the property where another eventually finds it. *Id.* However, treasure trove, despite not being lost or abandoned property, is treated as such in that the right to possession is recognized to be in the finder rather than the premises owner.

## C.   Discussion And Analysis

■ On appeal, Corliss argues that the district court should have interpreted the undisputed facts and circumstances surrounding of the placement of the coins in the ground to indicate that the gold coins were either lost, abandoned, or treasure trove.

Wenner argues that the property was properly categorized as either embedded or mislaid property.

As with most accidentally discovered buried treasure, the history of the original ownership of the coins is shrouded in mystery and obscured by time. The coins had been wrapped in paper, like coins from a bank, and buried in a glass jar, apparently for safekeeping. Based on these circumstances, the district court determined that the coins were not abandoned because the condition in which the coins were found evidenced an intent to keep them safe, not an intent to voluntarily relinquish all possessory interest in them. The district court also implicitly rejected the notion that the coins were lost, noting that the coins were secreted with care in a specific place to protect them from the elements and from other people until such time as the original owner might return for them. There is no indication that the coins came to be buried through neglect, carelessness, or inadvertence. Accordingly, the district court properly concluded, as a matter of law, that the coins were neither lost nor abandoned.

The district court then determined that the modern trend favored characterizing the coins as property either embedded in the earth or mislaid—under which the right of possession goes to the landowner—rather than treasure trove—under which the right of possession goes to the finder. Although accepted by a number of states prior to 1950, the modern trend since then, as illustrated by decisions of the state and federal courts, is decidedly against recognizing the "finders keepers" rule of treasure trove. *See, e.g.,* *Klein v. Unidentified, Wrecked & Abandoned Sailing Vessel,* 758 F.2d 1511 (11th Cir.1985) (treasure and artifacts from a sunken sailing ship properly characterized as embedded property); *Ritz,* 467 N.W.2d 266 (silver coins and currency dated prior to 1910 and 1928 gold certificates buried in cans and jars under a garage floor classified as mislaid property); *Morgan v. Wiser,* 711 S.W.2d 220 (Tenn.Ct.App.1985) (gold coins found buried in an iron pot properly characterized as embedded property).

Corliss argues that the district court erred in deciding that the law of treasure trove should not apply in Idaho. However, the doctrine of treasure trove has never been adopted in this state. Idaho Code § 73–116 provides: "[t]he common law of England, so far as it is not repugnant to, or inconsistent with, the constitution or laws of the United States, in all cases not provided for in these compiled laws, is the rule of decision in all courts of this state." Nevertheless, the history of the "finders keepers" rule was not a part of the common law of England at the time the colonies gained their independence. Rather, the doctrine of treasure trove was created to determine a rightful possessor of buried Roman treasures discovered in feudal times. *See* Leeanna Izuel, *Property Owner's Constructive Possession of Treasure Trove: Rethinking the Finders Keepers Rule,* 38 U.C.L.A. L.Rev. 1659, 1666–67 (1991). And while the common law initially awarded the treasure to the finder, the crown, as early as the year 1130, exercised its royal prerogative to take such property for itself. *Id.* Only after the American colonies gained their independence from England did some states grant possession of treasure trove to the finder. *Id.* Thus, it does not appear that the "finders keepers" rule of treasure trove was a part of the common law of England as defined by Idaho Code § 73–116. We hold that the district court correctly determined that I.C. § 73–116 does not require the treasure trove doctrine to be adopted in Idaho.

Additionally, we conclude that the rule of treasure trove is of dubious heritage and misunderstood application, inconsistent with our values and traditions. The danger of adopting the doctrine of treasure trove is laid out in *Morgan,* 711 S.W.2d at 222–23:

[We] find the rule with respect to treasure-trove to be out of harmony with modern notions of fair play. The common-law rule of treasure-trove invites trespassers to roam at large over the property of others with their metal detecting devices and to dig wherever such devices tell them property might be found. If the discovery happens to fit the definition of treasure-trove, the trespasser may claim it as his own. To paraphrase another court: The mind refuses consent to the proposition that one may go upon the lands of another and dig up and take away anything he

discovers there which does not belong to the owner of the land. [citation omitted]

The invitation to trespassers inherent in the rule with respect to treasure-trove is repugnant to the common law rules dealing with trespassers in general. The common-law made a trespass an actionable wrong without the necessity of showing any damage therefrom. Because a trespass often involved a breach of the peace and because the law was designed to keep the peace, the common law dealt severely with trespassers.

. . .

Recognizing the validity of the idea that the discouragement of trespassers contributes to the preservation of the peace in the community, we think this state should not follow the common law rule with respect to treasure-trove. Rather, we adopt the rule suggested in the concurring opinion in *Schley v. Couch,* [ . . . ] which we restate as follows:

Where property is found embedded in the soil under circumstances repelling the idea that it has been lost, the finder acquires no title thereto, for the presumption is that the possession of the article found is in the owner of the locus in quo.

Land ownership includes control over crops on the land, buildings and appurtenances, soils, and minerals buried under those soils. The average Idaho landowner would expect to have a possessory interest in any object uncovered on his or her property. And certainly the notion that a trespassing treasure hunter, or a hired handyman or employee, could or might have greater possessory rights than a landowner in objects uncovered on his or her property runs counter to the reasonable expectations of present-day land ownership.[2]

There is no reason for a special rule for gold and silver coins, bullion, or plate as opposed to other property. Insofar as personal property (money and the like) buried

or secreted on privately owned realty is concerned, the distinctions between treasure trove, lost property, and mislaid property are anachronistic and of little value. The principle point of such distinctions is the intent of the true owner which, absent some written declaration indicating such, is obscured in the mists of time and subject to a great deal of speculation.[3]

By holding that property classed as treasure trove (gold or silver coins, bullion, plate) in other jurisdictions is classed in Idaho as personal property embedded in the soil, subject to the same limitations as mislaid property, possession will be awarded to the owner of the soil as a matter of law. Thus, we craft a simple and reasonable solution to the problem, discourage trespass, and avoid the risk of speculating about the true owner's intent when attempting to infer such from the manner and circumstances in which an object is found. Additionally, the true owner,[4] if any, will have the opportunity to recover the property.

### D. Conclusion

We hold that the owner of the land has constructive possession of all personal property secreted in, on or under his or her land. Accordingly, we adopt the district court's reasoning and conclusion melding the law of mislaid property with that of embedded property and conclude, as a matter of law, that the landowner is entitled to possession to the exclusion of all but the true owner, absence a contract between the landowner and finder.

### IV.

### THE DISTRICT COURT'S ORDER GRANTING SUMMARY JUDGMENT IN FAVOR OF ANDERSON ON THE PROMISSORY NOTE

■ Because we conclude that the character of the gold coins and jar are governed

---

2. We note that nothing would prevent a would-be treasure hunter or hired builder or excavator from contracting some type of arrangement where the right of possession is shared or purchased outright.

3. As one commentator has wryly noted, "The old rule of treasure trove may make good theater,

but it's poor law, and its death can come none to soon." Richard B. Cunningham, *The Slow Death of the Treasure Trove,* ARCHAEOLOGY (Feb. 7, 2000).

4. We take no position as to whether a true owner would include testamentary or nontestamentary heirs.

by a blend of the law of mislaid property and personal property embedded in the soil and, thus, that the possessory interest goes to the landowner, we necessarily conclude that Corliss had no lawful claim to the gold coins. When Corliss borrowed $11,970 from Anderson against what he, and Anderson at the time, erroneously believed would be Corliss' share of the gold coins, his offer of the gold coins as collateral was a nullity. Corliss' impairment of collateral defense to the debt fails because there was in fact no collateral for the debt.

From our review of the promissory note, it is neither unclear nor ambiguous. Furthermore, Corliss admitted in his affidavit filed in response to Anderson's motion for summary judgment that he borrowed a sum plus interest totaling $11,970 from Anderson. While the note does not contain an express due date, I.C. § 28-3-108(1) fills the gap by providing that a promise to pay is payable on demand where no time for payment is stated. Anderson made demand on December 24, 1997. Thus, the district court correctly ordered summary judgment in favor of Anderson in the amount of $17,233.36, consisting of the $11,970 in principal, $1,695.36 in accrued interest from the date of demand, plus attorney fees pursuant to I.C. § 12-120(3).

Accordingly, the district court's order granting summary judgment in favor of Anderson on Corliss' promissory note is affirmed.

## V.

### COSTS AND ATTORNEY FEES ON APPEAL

Wenner and Anderson have also requested attorney fees on appeal. Because the issue of the legal characterization of the gold coins was certainly not frivolous, no attorney fees will be awarded to Wenner on appeal. Costs as a matter of right are awarded to Wenner as the prevailing party pursuant to I.A.R. 40. Anderson, however, will be awarded reasonable attorney fees as well as costs on his counterclaim. The mandatory attorney fees provision of I.C. § 12-120(3) governs on appeal as well as in the trial court. *Eagle Water Co., Inc. v. Roundy*

*Pole Fence Co., Inc.,* 134 Idaho 626, 629, 7 P.3d 1103, 1106 (2000).

Judge PERRY and Judge Pro Tem HORTON concur.